**STURGEON BAY SHIPBUILDING & DRY DOCK COMPANY, a corporation, Libelant,**

v.

**THE YACHT NAUTILUS, her engines, tackle, apparel and furniture, and Roger McCormick, Respondents.**

**Civ. A. No. 6436.**

United States District Court
E. D. Wisconsin.

Jan. 31, 1958.

Foster & Meadows, Detroit, Mich., John Kluwin, Bendinger, Hayes & Kluwin, Milwaukee, Wis., for plaintiffs.

Reuben W. Peterson, Jr., Wickham, Borgelt, Skogstad & Powell, Milwaukee, Wis., for defendant.

TEHAN, Chief Judge.

This contract action in admiralty was brought originally by the libelant Sturgeon Bay Shipbuilding & Dry Dock Company, of Sturgeon Bay, Wisconsin, against both the Yacht Nautilus, her engine, tackle, apparel and furniture, and Roger McCormick, resident of Chicago, Illinois, and owner of the yacht, respondents; however, in the same month of the commencement of the suit, the respondent yacht, a 65-foot houseboat Diesel type, sank in the Monroe Street Harbor in Chicago, Illinois, and the process of this Court did not attach it in rem. This action therefore is one for a personal judgment against Roger McCormick, (hereinafter sometimes referred to as the respondent) for the recovery of the sum of $6,463.35 allegedly due and owing for services, repairs and materials furnished monthly per itemized invoice accounts attached to the libel, stated over the period of October, 1952 through July, 1953.

The nature of the claims and the defenses thereto can be better appreciated if the libelant's claim of $6,463.35 is apportioned with relation to June 24, 1953, the date of a significant transaction as will hereafter appear. So divided, it appears that libelant demands $3,098.34 as the balance due it for services performed prior to and including June 24, 1953, and the sum of $3,365.01 for work performed thereafter.

The respondent's position on the pre-June 24th claim is that an unconditional agreement between himself and the officers of the libelant was entered into settling that claim for the sum of $15,800, of which he paid that day, $15,000. He admits owing the balance of $800, but nothing more. For reasons hereinafter set out, we hold for the respondent on this issue.

In respect of the post-June 24th billings, the respondent admits owing $268.-05 of the claimed $3,365.01, but denies liability for the $3,096.96 balance, upon the grounds that the work was not only unauthorized but that he gave express instructions that no further work was to be done on the yacht. On this issue we hold against the respondent and for the libelant.

The facts preceding the June 24th transactions are uncontroverted. The

respondent, Roger McCormick, was a resident of Chicago, Illinois, engaged in the insurance business as the President of Universal Mutual Casualty Company.

Sometime in 1947 he purchased the then 17 year old Yacht Nautilus for the sum of $35,000. For several years preceding 1952 he had engaged Captain Clell Baker as the Master thereof, and had been well pleased by his services. In October, 1952, Captain Baker brought the yacht to the libelant's yards for the winter layup and repairs.

Only one invoice was sent to McCormick during the remaining period of 1952 for services and materials rendered upon Captain Baker's authorization, and that was under date of October 31, in the sum of $407.80. However, somewhere around the first of the year 1953, the Captain ordered, among other things, the installation of an expensive teakwood deck. As a consequence, on January 31, 1953, McCormick was billed in the sum of $2,072.95; on February 28, 1953, in the additional sum of $3,507.19; and on March 31, a further sum of $1,602.89. Respondent neither paid nor acknowledged receipt of these invoices which by April totalled $7,590.83. That he received them in due course appears from a letter of his secretary advising that Mr. McCormick had left for Europe in April and would not return until the latter part of May, and assuring the libelant that Mr. McCormick had not overlooked the invoices. Furthermore, McCormick himself admits that he was aware of the amount of the charges up to March 31st, and that he had observed to Captain Baker, whom he saw with some frequency, on the fact that the repairs were more extensive than he had expected. Despite his concern with the already substantial expenditures he failed to place any limitations on the authority of the Captain. He excused his failure to so do on the grounds that he was extremely busy with other affairs and was getting off to a trip to Europe. During his absence on the European trip he was billed for $3,794.21 for the period ending April 30th, and for $3,474.81 as

of May 31st. When he returned to Chicago around the middle of June, he was therefore confronted with billings totalling $14,859.85.

Approximately ten days later, and on the 24th of June, 1953, he made a trip to Sturgeon Bay to the shipyards of libelant in the company of a friend who was in the marine insurance business. The conference which resulted from the Sturgeon Bay trip involves the controverted element of this case. The respondent recites that upon arriving at the shipyard, he immediately went to his yacht and spent a couple of hours inspecting it. He conceded he found the work done completely satisfactory; in fact he admits that the yacht was in far superior condition to what it had ever been before. His concern and his complaint, however, was that he felt that too much had already been expended considering the value of the hull. After the inspection, he went to the libelant's shipyard office where he had a conference with Mr. Floyd B. Knuth, its assistant secretary and comptroller, and Mr. Lloyd Spude, its yard superintendent.

It is the respondent's contention that that conference had two results: (1) That a final and unconditional settlement of the shipyard's charges to date of June 24, 1953, was made at the price of $15,800, and (2) That the shipyard officers were instructed to do no further work on the vessel, excepting only in express and minor respects, not here in issue.

That there was a final settlement of all the pre-June 24th claims of the libelant for the sum of $15,800, is overwhelmingly established by the evidence. On June 24th the billings from the period of June 1st to June 24th were not available. In negotiating a settlement to date, it appears that the libelant's officers stated that they estimated that the amount due was somewhere between $16,000 and $17,000. They agreed to take $15,800 in satisfaction of all claims to date. The respondent agreed, and thereupon wrote out his check for $15,000. He told them that the remaining $800 would be forth-

coming after he had an opportunity to look over the billings for the period of June 1st to June 24th to learn what actually had been done.

Six months later, by letter of January 6, 1954, libelant for the first time suggested that the settlement agreement of June 24th was conditioned upon the payment of the balance of $800 as soon as respondent returned to Chicago, that the condition was breached, and that the libelant would assert its right to declare due and payable the unpaid balance of the billings to June 24th, which had since been computed as being $18,098.34, unless the respondent's check were received by the 15th of January. Libelant returned respondent's check for $800 because it bore the notation "Paid in Full", but advised him that it would extend the time to February 5th, to consummate the settlement agreement.

We are entirely satisfied that a final and unconditional agreement was made on June 24th settling all of libelant's claim through that date for the sum of $15,800. Neither of libelant's officers were able to testify that they had stated that the balance of $800 had to be paid by any specific date, or the libelant would declare the entire amount due.

■ The relative insubstantiality of the amount withheld, being a token 5%, would argue against the need or justice of imposing a condition, the more so in view of the fact that it still had possession of the yacht. Libelant's conduct too is entirely inconsistent with its position that respondent was in breach of the agreement when he failed to remit the $800 check when he reached Chicago a day or two later. Not until six months later does libelant assert the existence of a condition, and then and thereafter in terms wanting in certainty and conviction. We find that the respondent was justified in being unable to satisfy himself of precisely what work was covered by the settlement. Not only was the bill for the work up to and including June 24th unclear, but the matter was obscured by subsequent billings. It follows therefore that we sustain respondent's

position that he owes only $800 for the work performed up to and including June 24, 1953.

That brings us to the matter of the post June 24th account. It appears that two sets of invoices were submitted to the respondent, one covering the work up to and including June 24th, which reflected the settlement agreement of $15,800, and another for the work done subsequent to June 24th and up to the 30th of June, which was in the sum of $1,202.63. On July 31, 1953, the final invoice showing billings in the amount of $2,162.38 was submitted making the total amount due for work begun subsequent to June 24th $3,365.01. That the work reflected in the billings and the charges were reasonable is not disputed. Respondent's sole contention is that at the June 24th conference he expressly told them that no further work, excepting minor details not here significant was to be done. Respondent insists that that instruction was not only clear, but that he had put it "dramatically" in the words "If the ship be sinking do not throw a line," which he thought "was as strong, as clear language as I could use in the instance of a boat."

The libelant's officers deny that any such final unconditional instruction was given. They admit that at the conference the respondent showed concern and anxiety about putting so much money into an old hull, but they claim that their express instruction from the respondent was not to commence any new work and that except for two items of repair totalling $268.05, which were unforeseen and of an emergency character and admittedly essential to the navigability of the yacht, no new projects were undertaken.

■ The overwhelming weight of the evidence sustains the libelant's position that the instruction given and the understanding of the parties was that no new work was to be commenced but that the projects under way would be completed. The respondent's own letter of January 14, 1954, should of itself dispose of the issue. The significant part is as follows:

"By the time you had explained to me that the $940.15 shown in the lower right hand corner of the invoice did *not* indicate a balance owed by me, a new problem arose. This was my discovery that you had started a good deal of work, *not in process* (italics ours) on the day of our settlement, on which date we had agreed that no *new* (italics ours) work would be begun."

Even without such express written admissions we would have to hold that by failing expressly to revoke or limit Captain Baker's authority, he must be held liable for the work done in Captain Baker's presence or under Captain Baker's direction. The respondent's solicitude for the sensibilities of Captain Baker verges on reverence. The record of this case shows that the respondent expected the yearly lay-up expenses would run somewhere between $1,500 and $2,000. He admits having had the opportunity of conferences with the Captain on frequent occasions because of the fact that the Captain returned to his Chicago home on most weekends. Yet at a time prior to his leaving for Europe and when the billings were very substantially in excess of the anticipated cost, he never advised the shipyards of any limitation whatsoever on the Captain's authority. When he returned from Europe and went to Sturgeon Bay at the time the billings were in excess of $14,000, he explained his failure to bring the Captain into the conference and curb his contractual power, with the statement that he did not want to humiliate or embarrass him. Later, and after he had been apprised by the June 30th invoices that there was substantial work in progress, he contented himself with a conference with the Captain who explained that there was some misunderstanding.

There is a dispute as to whether he made another visit to the shipyard on July 10th, but even then in his reported conference in the office of the libelant's assistant secretary and comptroller, he placed no restriction on the Captain's activities.

Our remaining and sole inquiry therefore is whether any new work was undertaken contrary to respondent's instructions. We have carefully gone over the exhibits and re-read the testimony on this point, and are unable to find any projects that did not flow from those that were underway as of June 24th.

We therefore find due and owing from the respondent to the libelant $800, said sum being the balance due on the settlement agreement of June 24th, and further that there is due and owing by the respondent to the libelant the sum of $3,365.01 for labor, services and materials furnished subsequent to June 24, 1953.

This Opinion will stand as findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

Accordingly, It is Ordered, that judgment in favor of libelant will be entered in the gross sum of $4,165.01, together with costs and disbursements and interest from February 5, 1954, to the date of the entry of final judgment.

The libelant will prepare a judgment in accordance with this Opinion and submit it to the respondent for approval as to form.